IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No. 7:20-CV-00254-M

| | | |
|---|---|---|
| ROSE HILL UNITED METHODIST CHURCH, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| CHURCH MUTUAL INSURANCE COMPANY, S.I., | ) ) ) | |
| Defendant. | ) ) | |

This matter comes before the court on Defendant Church Mutual Insurance Company S.I.'s (CMIC's) motion to dismiss [DE 23] the claims filed by Rose Hill United Methodist Church (Rose Hill). Rose Hill's action arises from an insurance claim it filed with CMIC after a January 2018 fire. CMIC eventually paid the maximum amount recoverable after Rose Hill prepared its own estimate and availed itself of the policy's dispute resolution process. Still, Rose Hill contends that CMIC deliberately undervalued its claim by excluding certain features and materials from its earlier replacement cost estimate and settlement offer.

The court construes CMIC's motion as one for judgment on the pleadings. Taking Rose Hill's well-pleaded factual allegations as true, the court grants in part and denies in part CMIC's motion. Rose Hill does not allege facts showing a violation of the policy's provisions to support a plausible breach of contract claim. Rose Hill's allegations about CMIC's claims-handling practices do, however, state plausible bad faith and unfair trade practices claims.

## I. Background

### A. Factual Background

The following factual allegations are accepted as true, as they must be at this stage of the pleadings.

**The Church:** Before burning in January 2018, Rose Hill's main church structure stood for nearly 100 years in Duplin County, North Carolina. DE 1 ¶¶ 1,10–11. This 9,750 square-foot Gothic-style structure included many "artisanal" features, such as

> buttressed, six-wythe-brick structural exterior walls; [three]-coat plaster interior walls with custom judges paneling and other interior wood finishes; heavy-timbers; custom, gothic-style windows and doors (with hand-formed, arched openings, and custom-built door and window assemblies), and custom decorative masonry and other stonework throughout its interior and exterior aspects, with a cathedral-ceiling in its sanctuary and myriad stained glass windows.

*See id.* ¶ 10–11. The church's design features were "of critical import" to the spiritual atmosphere Rose Hill's congregants seek to cultivate during worship. *See id.* ¶¶ 12, 15 (describing, for example, how arched, stained-glass windows illuminate the church and how the walls' thickness creates "somber and dignified acoustics"). The fire "destroyed" the church and damaged other buildings on Rose Hill's campus. *See id.* ¶ 9. Rose Hill submitted a claim under its insurance policy the same day. *Id.* ¶ 43.

**The Policy:** At the time of this fire, CMIC insured under a blanket policy (the Policy) [DE 1-1] all buildings on Rose Hill's campus and their contents. *See id.* ¶ 17. In the event of a covered loss or damage to this property, CMIC was required to make a loss payment after (1) the parties reached an agreement about the amount of loss or (2) an appraisal award was made. *See* DE 1-1 at A 100 (01-01) C(4)(g) (conditioning this payment on other procedural requirements). Elsewhere in the same "Loss Payment" provision, the Policy states that CMIC would "determine the value of the lost or damaged property, or the cost of its repair or replacement, in accordance

with the applicable terms of the Valuation Condition in this Coverage Form." *See id.* at A 100 (01-01) C(4)(a).

That Valuation Condition states that CMIC would "not pay more for loss or damage on a Replacement Cost basis than the least of" the coverage limits, the cost to replace the lost property with a structure "1) [o]f comparable material and quality[] and 2) [u]sed for the same purpose," and the amount spent to repair the structure. *See id.* at A 100 (01-01) C(7)(a)(4); DE 1 ¶ 19. At that time, the Policy had a blanket coverage limit of $3,734,375.40. *See* DE 1 ¶ 20 (noting that this adjusted figure did not include $10,000 in additional demolition coverage and $100,000 "in additional coverage for code-compliance/upgrades"); *see also* DE 1-1 at A 001 P(10-99) – NC (stating that the $3,579,000.00 coverage limit was subject to adjustment according to construction cost indices).

The Policy allows either party to seek a binding appraisal if they "disagree on the value of the property or the amount of the loss." *See* DE 1-1 at A 100 (01-01) C(2). This dispute resolution provision states that both parties will select and pay impartial appraisers. *See id.* The two appraisers will separately estimate these figures and submit any remaining differences to an umpire they select. *See id.* Any award agreed to under this process binds the parties and satisfies one of the preconditions for loss payment. *See id.*; *id.* at A 100 (01-01) C(4)(g).

**CMIC's Inspection and Initial Estimate:** CMIC assigned George Hodges as its "Field General Adjuster" on Rose Hill's claim and retained York Risk Services Group (York) as an independent adjuster. DE 1 ¶ 45. York assigned William Smith to Rose Hill's claim. *See id.* CMIC also retained J.S. Held as a construction consultant, and J.S. Held assigned John Schneider as its senior estimator for the claim. *Id.*

Roughly three weeks after the fire, Mr. Smith and Mr. Schneider inspected the insured property. *See id*. During this inspection, CMIC's agents could "identify[ ]with their own very eyes" many aspects of the church's design. *See id.* ¶ 73. These included "the custom forms on all the gothic arches, the brickwork and other masonry and stonework, the plaster walls, the custom[-]built window and door casings, the woodwork throughout, the beams and buttresses, the stairwells," and other features. *See id.* (recounting, in an email from Rose Hill's counsel, what CMIC's agents could observe when they inspected the "burned bones of the church"); *see also id.* ¶ 74 (incorporating these allegations into the complaint). Although Rose Hill "ma[de] all information reasonably required" to estimate the demolition and replacement costs "reasonably available", CMIC's agents "deliberately" undervalued their assessment of the costs required to rebuild the church. *See id.* ¶ 47.

CMIC's agents relied on *Xactimate* software as the sole "basis for the overall adjustment and valuation of the monies owed" under the Policy. *See id.* ¶ 45. They prepared their estimate of the demolition and replacement costs by entering the dimensions of the church structure's interior and exterior aspects into *Xactimate* and making "rough designations" of the materials to be used. *See id.* Rose Hill alleges that insurance industry practitioners widely regard *Xactimate* as an inaccurate means of estimating the costs of replacing "historic, artisanal, or otherwise unique structures." *See id.* ¶ 49 (contending that the software can underestimate the true cost to replace these structures "by a factor of double, triple, or more" because it is designed for more standardized construction applications like tract housing). Moreover, this estimate excluded the specifically identified features Rose Hill alleged CMIC's agents had observed. *See id.* ¶ 73.

In April 2018, CMIC provided Rose Hill with an estimate of approximately $1.8 million in replacement cost value. *See id.* ¶ 45 (explaining that, after various offsets, CMIC's proposed

4

final payout was approximately $1.7 million). Under the Policy, replacement cost includes the costs needed to demolish the existing structure, remove the debris, and replace it with a structure of "comparable material and quality." *See id.* CMIC estimated a depreciated actual cash value (ACV) of approximately $1.0 million and tendered this amount to Rose Hill in May 2018. *See id.* (allowing for payments up to the estimated replacement cost value upon proof that Rose Hill incurred the costs). CMIC's estimate caveated that "[t]he estimated scope of damages and prices contained in this document are based upon the damages viewed by the York SLA Adjuster at the time of the inspection." *See* DE 1-2 at 1 (noting that these estimates "do not represent any hidden damages that may later be discovered").

Rose Hill contends that, despite this disclaimer and the Policy's reference to a replacement structure of "comparable material and quality," CMIC's estimate reflected several deliberate omissions and scope inadequacies. *See* DE 1 ¶ 48 (specifying the alleged omissions in a detailed list). Rose Hill advised CMIC that it "could not even demolish the destroyed structure for anything close to the demolition figure" incorporated into CMIC's replacement cost estimate. *See id.* ¶¶ 51–52 (noting that the demolition vendor "detected hazardous materials and myriad other complexities overlooked by [CMIC]" and required a demolition payment almost 50 percent higher than CMIC's initial demolition estimate). Rose Hill also relayed that construction vendors bidding to rebuild the church were quoting figures three times higher than CMIC's replacement cost estimate. *See id.* ¶ 53. CMIC offered no "meaningful response" to these concerns. *See id.* ¶ 54. CMIC also made several "misrepresentations" about the Policy's coverage. *See id.* ¶ 55 (alleging that CMIC claimed that only "contemporary construction methods" would be covered).

**Rose Hill's Investigation and Estimate:** After receiving CMIC's estimate, Rose Hill retained counsel, a public adjustor, and a contractor experienced in the local "historical renovation

sector" to prepare its own estimates. *See id.* ¶¶ 55, 58. York's Mr. Smith expressed to Rose Hill's counsel his "relief" that these professionals had been hired. *See id.* ¶ 59. He "confess[ed]" that he found CMIC to be "entirely unresponsive" to Rose Hill's stated concerns that the bids they were receiving for demolition and replacement were "shockingly higher than the figures [CMIC was] then insisting upon." *See id*.

By this time, the burned structure CMIC's agents inspected was no longer available to examine. *See id.* ¶ 60, 73. Faced with this limitation, Rose Hill's team instead conducted a "virtual reassembly" of the church based on photographs, interviews, reviews of the public record, and visits to similar churches in the region. *See id.* ¶¶ 60–61. This process yielded an "accurate" replacement cost estimate of approximately $5.1 million, with a depreciated ACV of approximately $4.2 million. *See id.* ¶ 62. Rose Hill provided this estimate to CMIC in March 2019. *Id*.

**CMIC's Requests and Revised Estimates:** CMIC retained counsel after reviewing Rose Hill's estimate. *See id.* ¶ 63. CMIC then requested all documentation and "other information" Rose Hill's team had considered. *Id.* ¶ 64. Rose Hill's counsel provided documentary evidence but advised that much of the "other information" was not "producible." *See id.* ¶ 65 (explaining that it reflected the professionals' experience and first-hand observations).

Personnel from J.S. Held and BluSky Restoration Contractors (BluSky) met with Rose Hill's team to discuss the support for their estimates. *See id.* ¶ 68. Unlike J.S. Held's fee-based arrangement with CMIC, BluSky had been asked to prepare an estimate for the opportunity to replace the structure. *See id.* ¶ 69. The meeting concluded with the understanding that BluSky would prepare its estimate while J.S. Held would reassess CMIC's original estimate. *See id.* ¶ 70.

Although BluSky personnel were "pressured" by CMIC to reduce their replacement cost figures, *see id.* ¶ 72, BluSky's estimates exceeded the Policy's coverage limits after accounting for demolition, design, and permitting fees, *see id.* ¶ 76 (alleging that BluSky's $3.7 million replacement cost estimate would reach at least $4.4 million after including these covered costs); *see also* DE 1-4 at 4. J.S. Held also revised CMIC's original estimate to include the design features it had omitted before, resulting in an $3.5 million replacement cost estimate and depreciated ACV of $2.7 million. *See id.* ¶ 75 (alleging that this replacement cost estimate would also exceed $4.4 million after making similar adjustments); *see also* DE 1-3 at 61. CMIC paid an additional $1.8 million, bringing the total paid on the claim to just $2.9 million. *See* DE 1 ¶ 77 (noting that this left an unpaid remaining balance of over $600,000 on the Policy's coverage limits).

Rose Hill invoked the Policy's appraisal clause in November 2019. *Id.* ¶ 78. Rose Hill and CMIC each retained independent appraisers who agreed to a replacement cost figure over $5.1 million and approximately $3.9 million in ACV. *See id.* ¶ 79; *see also* DE 1-6 at 1. In compliance with this July 2020 appraisal award, CMIC paid the remaining amount available under the Policy's coverage limit in August 2020. *See* DE 1 ¶ 79. This appraisal process cost Rose Hill over $30,000, *id.* ¶ 81, pushing its total professional fees and costs incurred over $875,000, *see id.* ¶ 92.

### B. Procedural Background

Rose Hill sued CMIC in December 2020, alleging claims for (1) breach of contract, (2) bad faith, and (3) unfair trade practices in violation of N.C. Gen. Stat. § 75-1.1 (the UDTPA). DE 1. CMIC answered this complaint in March 2021. *See* DE 14 at 1 (raising as a defense Rose Hill's failure to state a claim). Several months later, CMIC moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). DE 23. Rose Hill responded in opposition, DE 30, and CMIC replied, DE 32.

7

## II. Legal Standards

### A. Dismissal for Failure to State a Claim

A defendant can raise as a defense the plaintiff's failure to state a claim "by motion under Rule 12(c)." *See* Fed. R Civ. P. 12(h)(2)(B). This motion may be made "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Because CMIC moved to dismiss after filing its answer, its motion will be construed as one for judgment on the pleadings under Rule 12(c). *See Burbach Broad. Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401, 405 (4th Cir. 2002).

Courts evaluate Rule 12(c) motions under the same standards as Rule 12(b)(6) motions. *See id.* at 405–06. The question remains whether the plaintiff's well-pleaded factual allegations, accepted as true, "state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). *Twombly's* plausibility standard requires that a plaintiff's well-pleaded factual allegations "be enough to raise a right to relief above the speculative level." *Id.* at 555. When making this determination, all reasonable inferences from the well-pleaded factual allegations must be drawn in the non-movant's favor. *See Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 702 (4th Cir. 2016). Still, a speculative claim resting on conclusory allegations without sufficient factual enhancement will not survive the challenge. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

At the Rule 12(c) stage, the court considers the factual allegations in the complaint as well as those in the answer that do not contradict the complaint. *See First Protective Ins. Co. v. Rike*, 516 F. Supp. 3d 513, 524 (E.D.N.C. 2021). The court may also "consider the pleadings and any materials referenced in or attached to the pleadings." *See id.* (citing Fed. R. Civ. P. 10(c)) (explaining that these are "incorporated by reference"). But factual contentions presented only in

briefing will not be considered. *See Bush v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 124 F.

Supp. 3d 642, 654 (E.D.N.C. 2015).

### B. North Carolina Law Applies

Courts sitting in diversity apply the substantive law of the state in which the action arose.

*See Adams v. Am. Optical Corp.*, 979 F.3d 248, 255 (4th Cir. 2020); *see also* DE 1 ¶¶ 1–8. All

agree that North Carolina law applies. *See, e.g.*, DE 24 at 10; DE 30 at 11. Thus, the court must

predict how the Supreme Court of North Carolina would interpret the provisions at issue. *Twin*

*City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.*, 433 F.3d 365, 369 (4th Cir. 2005).

In doing so, the court must look first to opinions of the Supreme Court of North Carolina. *See id.*

Without such guidance, this court may consider the opinions of the North Carolina Court of

Appeals, treatises, and "the practices of other states." *See id.* (quotation and citation omitted).

Applicable interpretations by the North Carolina Court of Appeals control absent convincing

evidence that the Supreme Court of North Carolina would decide differently today. *See Town of*

*Nags Head v. Toloczko*, 728 F.3d 391, 398 (4th Cir. 2013). This court also may not create or

expand state policies when forming its predictions about how the Supreme Court of North Carolina

would rule. *See Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec.*

*Membership Corp.*, 506 F.3d 304, 314–15 (4th Cir. 2007).

### III. Discussion

#### A. Rose Hill does not state a plausible breach of contract claim when CMIC paid the maximum amount recoverable under the Policy after Rose Hill availed itself of the Policy's appraisal provision.

A claim for breach of contract under North Carolina law involves two elements: "(1) the

existence of a valid contract, and (2) the breach of the terms of that contract." *Lake Mary Ltd.*

*P'ship v. Johnston*, 145 N.C. App. 525, 536, 551 S.E.2d 546, 554 (2001). "[A]n insurance policy

is a contract and its provisions govern the rights and duties of the parties thereto." *Gaston Cnty.*

9

*Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 299, 524 S.E.2d 558, 563 (2000). As a result, courts must "construe and enforce insurance policies as written, without rewriting the contract or disregarding the express language used." *Fid. Bankers Life Ins. Co. v. Dortch*, 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986). CMIC does not challenge Rose Hill's allegation that the Policy constituted a contract but maintains that no terms were breached. *See* DE 24 at 10.

Rose Hill alleges that CMIC breached its contractual obligations by "fail[ing] and refus[ing] to voluntarily provide" the full amounts owed until Rose Hill retained its own professionals and sought to correct CMIC's estimates. *See* DE 1 ¶ 90. In particular, Rose Hill alleges that CMIC's replacement cost estimate did not reflect a structure of "comparable material and quality" as required by the Policy. *See id.* Rose Hill seeks to recover the professional fees and other expenses it incurred to develop its own estimate and obtain a favorable award under the Policy's appraisal process. *See id.* ¶¶ 91–92.

CMIC maintains that an insurer cannot be held liable for breach of contract when a disagreement about a claim's value is submitted to the policy's dispute resolution process and the insured prevails. *See* DE 32 at 2. CMIC cites several federal district court decisions rejecting similar breach of contract claims by insured plaintiffs who argued that their insurer undervalued their claim and forced them to invoke their policies' dispute resolution processes. *See* DE 32 at 2–3 (citing *Chew v. Progressive Universal Ins. Co.*, 2010 WL 4338352, at *8 (E.D.N.C. Oct. 25, 2010); *Lemons v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 2011 WL 2565617 (M.D.N.C. June 28, 2011); *Bendrick v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 1247158, at *5 (W.D.N.C. Mar. 7, 2012)). Rose Hill responds that it adequately alleged a violation of CMIC's "express contractual valuation *duty* to value its replacement of destroyed insured property 'with other property of comparable material and quality.'" *See* DE 30 at 12; *see also* DE 30 at 15–17 (contending that its

specific allegations about CMIC's claims-handling practices distinguish this case from *Chew*, *Lemons*, and *Bendrick*).

In this respect, Rose Hill's contentions mirror those considered in *Guessford v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 918 F. Supp. 2d 453 (M.D.N.C. 2013). The plaintiff in *Guessford* also brought breach of contract, bad faith, and UDTPA claims against his insurer after availing himself of his policy's dispute resolution process and recovering the maximum amount available. *See id.* at 458–59. Like Rose Hill, the plaintiff in *Guessford* sought to distinguish the "honest disagreements over the value of coverage due" in *Chew*, *Lemons*, and *Bendrick* from his more specific allegations about his insurer's deliberate failure to properly value his claim. *Compare id.* at 460–62 (alleging that the insurer undervalued the claim despite being provided with the medical documentation necessary to establish his losses), *with* DE 30 at 15–16 (purporting to distinguish the same cases based on allegations about how CMIC's agents undervalued the claim by omitting features they observed during their inspection).

The crux of the plaintiff's breach of contract claim in *Guessford* was that his insurer failed to properly investigate or make any reasonable settlement offer despite having the information necessary to do so, forcing the plaintiff to resolve the claim under his policy's dispute resolution process. *See* 918 F. Supp. 2d at 460. The court, however, found no policy provision had been breached. *See id.* at 462. The policy did not obligate the insurer to make a settlement offer. *See id.* Instead, the policy set forth procedures for resolving valuation disputes. *See id.* The plaintiff invoked this provision, both parties complied with this process, and the defendant promptly paid the resulting award. *See id.* While the court noted that the alleged claims-handling practices may be actionable under the plaintiff's other claims, it held these did not plausibly establish a violation of any obligation under the policy to support a breach of contract claim. *See id.* at 462–63.

As the Policy governs the parties' duties, consideration of Rose Hill's breach of contract claim must begin with the language at issue. *See id.* at 460; *Fid. Bankers Life Ins. Co.*, 318 N.C. at 380, 348 S.E.2d at 796. The Policy provision Rose Hill emphasizes about a structure of "comparable material and quality" speaks to one of the possible caps beyond which CMIC "will not pay more for loss or damage on a Replacement Cost basis." *See* DE 1-1 A 100 (01-01) C(7)(a)(4). CMIC satisfied this obligation by paying up to a different cap—the Policy's coverage limit. *See* DE 1 ¶ 79.

No Policy provision required CMIC to offer payment up to these limits "voluntarily." Instead, the Policy provided an appraisal process to resolve valuation disputes. *See* DE 1-1 at A 100 (01-01) C(2); *Guessford*, 918 F. Supp. 2d at 462 (finding that a comparable provision showed that the insurer did not have to settle the insured's claim). Indeed, CMIC was not obligated to make a loss payment on the disputed portions of the claim until after this appraisal award had been made. *See* DE 1-1 at A 100 (01-01) C(4)(g) (establishing this and the parties' agreement as to the amount of loss as two alternative preconditions on CMIC's loss payment obligation). Consistent with the Policy's provisions, the parties hired appraisers, *see* DE 1 ¶¶ 80–81, the appraisers agreed to a binding award, *see id.* ¶¶ 79–80, and CMIC timely paid the remaining balance of the Policy's coverage limits, *see id.* ¶ 79.

In sum, CMIC ultimately paid the full amount recoverable after complying with the Policy's dispute resolution process. Rose Hill does not plausibly state a breach of contract claim by alleging that CMIC did not make a reasonable settlement offer despite having the information it needed to do so. *See Guessford*, 918 F. Supp. 2d at 460, 462–63 (describing a similar contention as the "crux" of the breach of contract claim on which the court granted judgment on the pleadings for the insurer). As in *Guessford*, these allegations about claims-handling practices instead speak

to CMIC's potential liability under the tort and UDTPA claims. *See id.* at 462–63. CMIC's motion for judgment on the pleadings is thus granted as to Rose Hill's breach of contract claim.

**B. Rose Hill's allegations, including the allegation that CMIC's agents deliberately omitted certain structural features from their estimates, support plausible bad faith and UDTPA claims.**

Eventual compliance with the Policy's provisions does not insulate CMIC from all potential liability for its claims-handling practices. *See Robinson v. N. Carolina Farm Bureau Ins. Co.*, 86 N.C. App. 44, 49–50, 356 S.E.2d 392, 395 (1987) (agreeing that an insurer "is not absolved from punitive damages because it later performed as it should"). While the North Carolina Court of Appeals noted that "most" cases will involve an insurer's refusal to pay, *Robinson* rejected the argument that other claims "cannot exist where coverage is not denied, settlement is not refused, and the policy limits are timely paid." *See id.* ("We find nothing in the case law which requires that the tortious conduct be accompanied by a breach of the contract . . . ."). Rose Hill incorporates all the allegations above in support of its common law bad faith and UDTPA claims. *See* DE 1 ¶¶ 93, 102. The court addresses the parties' dispute about an allegation central to both claims before considering them individually.

CMIC challenges Rose Hill's contention that its agents "knowingly and deliberately" omitted certain structural features from its replacement cost estimates. *See* DE 32 at 5 (contending that Rose Hill's bad faith and UDTPA claims are both based on this allegation). CMIC argues that this contention "rests on the faulty premise that CMIC learned the traits of the structure when it viewed the burned remains." *See id.* Rose Hill's complaint does, indeed, allege that CMIC's agents saw certain specifically identified features "with their own very eyes" when they examined "the burned bones of the church." *See* DE 1 ¶¶ 73–74 (explicitly incorporating this allegation from an October 2019 email into the complaint); *id.* ¶ 45 (alleging that CMIC's agents "inspect[ed]" Rose Hill's campus). CMIC urges the court to disregard this allegation on two grounds.

First, CMIC argues that the factual allegations about its agents' observations during their inspection should be rejected as implausible. *See* DE 32 at 5. CMIC notes that it "is not omniscient" and contends that "viewing the 'burned bones of the church,' by nature, is not the same as seeing the standing structure." *See id.* (quoting DE 1 ¶ 73)). In other words, CMIC contends that the fire damage was so severe that its agents could not have seen features like the church's buttresses or the thickness of its walls. *But see* DE 1 ¶ 73 (alleging that these and other features were observable).

This argument urges a plausibility determination that cannot be made when considering Rule 12(c) and 12(b)(6) motions. "While 'the factual allegations in a complaint must make entitlement to relief plausible,' Rule 12(b)(6) does not countenance 'dismissals based on a judge's disbelief of a complaint's factual allegations.'" *Wright v. North Carolina*, 787 F.3d 256, 268 (4th Cir. 2015) (quoting *McLean v. United States*, 566 F.3d 391, 399 (4th Cir. 2009), *abrogated on other grounds by Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1724 (2020)). Put differently, under the standards set by the Supreme Court, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

The court thus cannot reject Rose Hill's factual allegations about what design features CMIC's agents observed. At this stage, these allegations are accepted as true. The court must, instead, determine whether they state plausible bad faith and UDTPA claims when taken together with Rose Hill's other well-pleaded factual allegations.

Second, and relatedly, CMIC contends that Rose Hill's pleaded allegations "show that CMIC needed more information to adjust the claim" after the inspection. *See* DE 32 at 5. CMIC points to paragraphs of the complaint alleging that it requested documents supporting Rose Hill's

estimate, *see id.* at 6 (citing DE 1 ¶ 64), and was told that much of the relevant information was not in a "producible" form, *id.* at 6–7 (citing DE 1 ¶ 65) (arguing that this "undercuts the notion that CMIC, somehow, had this information all along"). But Rose Hill alleges that CMIC's agents did observe the features incorporated into Rose Hill's estimate, *see* DE 1 ¶ 73, and that Rose Hill's team had to gather information by other means because they had no opportunity to inspect the structure, *see id.* ¶ 65. Rose Hill argues from these allegations that CMIC's request for information it already possessed was another effort to avoid paying the claim's full value. *See* DE 30 at 17–18. CMIC offers a competing interpretation of the alleged facts, but all reasonable inferences must now be drawn in Rose Hill's favor. *See Belmora LLC*, 819 F.3d at 702.

Resolving the factual dispute at the core of these arguments would be premature at this stage. *See Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014) (acknowledging that "[a] Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact"). If Rose Hill's allegations about CMIC's observations and the availability of the relevant information cannot be substantiated after adequate time for discovery, CMIC can of course renew these arguments in a motion for summary judgment. *See, e.g.*, *Graves v. Lioi*, 930 F.3d 307, 330 (4th Cir. 2019) ("None of those allegations in the Complaint, which were the subject of the motion to dismiss and our prior decision, are borne out by evidence at the summary judgment stage."). The court cannot, however, grant judgment on the pleadings by discounting detailed factual allegations. Thus, the court accepts as true for this motion Rose Hill's allegation that CMIC's agents observed the features specified in the complaint during their inspection and excluded these from their estimates.

### 1. Rose Hill's Bad Faith Claim

North Carolina law recognizes a tort for bad-faith refusal by an insurance company to settle a claim. *See Lovell v. Nationwide Mut. Ins. Co.*, 108 N.C. App. 416, 420, 424 S.E.2d 181, 184,

*aff'd*, 334 N.C. 682, 435 S.E.2d 71 (1993). To state a claim for an insurer's bad-faith refusal to settle, the plaintiff must plausibly allege an insurer's (1) refusal to pay after recognition of a valid claim and (2) bad faith. *See Martinez v. Nat'l Union Fire Ins. Co.*, 911 F. Supp. 2d 331, 337 (E.D.N.C. 2012). To recover punitive damages on such claims, the plaintiff must also show "aggravating or outrageous conduct." *See id.* at 337 n.2 (citing *Lovell*, 108 N.C. App. at 420, 424 S.E.2d at 184) (explaining that the first two requirements apply to all tort claims for bad-faith refusal to settle). CMIC contends that Rose Hill has not alleged facts sufficient to establish any of these three elements. DE 24 at 13.

First, CMIC argues that Rose Hill does not plead any facts showing that CMIC recognized the validity of its claim and failed to pay. *See id.* at 14-15; DE 32 at 4. CMIC's argument about this first element has two components. To start, CMIC points out that Rose Hill's complaint does not expressly allege this. *See* DE 32 at 4. CMIC further notes that payment on the undisputed portions of Rose Hill's claim did not impliedly recognize the whole claim to be valid. *See* DE 32 at 4 (citing *Blis Day Spa, LLC v. Hartford Ins. Grp.*, 427 F. Supp. 2d 621, 632 (W.D.N.C. 2006)). Though both observations are true, neither precludes Rose Hill's bad faith claim from proceeding.

Rose Hill's complaint necessarily alleges that CMIC recognized the validity of the unpaid portions of the claim. Rose Hill alleges that CMIC's agents "deliberately . . . undervalued their assessment of the cost required to rebuild" the church. *See* DE 1 ¶ 47; *see also id.*¶ 7 (alleging that they did so "knowingly"). Indeed, Rose Hill characterizes the allegedly deliberate undervaluation of its claim as "the gravamen of this lawsuit." *See* DE 30 at 2. The allegations that CMIC "knowingly" and "deliberately" undervalued Rose Hill's claim presuppose that those performing the valuation recognized that what they omitted ought to have been included. True, Rose Hill did not allege CMIC's recognition in as many words. *Cf. Guessford*, 918 F. Supp. 2d at

466 (finding this first element satisfied where "Plaintiff allege[d] in his Complaint that 'by around July 14, 2009, Defendant had recognized that Plaintiff's claim was valid'"). But Rose Hill's bad faith claim does not fail just because it did not couch its contentions in the same phrasing courts have used when identifying this element. *See generally Iqbal*, 556 U.S. at 678–79 (recognizing that Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical code pleading regime of a prior era").

Rose Hill's complaint includes sufficient factual enhancement to support this allegation. *Cf. id.* (noting that conclusory statements do not suffice). Insured plaintiffs must do more than "merely assert that [their insurer] had no reasonable basis to deny them 'full payment.'" *See Huang v. State Farm Fire & Cas. Co.*, No. 5:14-CV-00069-RN, 2015 WL 1433553, at *4 (E.D.N.C. Mar. 27, 2015) (recommending dismissal of a bad faith claim when the plaintiffs "provide[d] no facts to distinguish this dispute from a good faith disagreement over the scope of compensable damage"). Rose Hill makes a comparable contention*, see* DE 1 ¶ 97 (describing CMIC's valuation position as "devoid of factual or legal merit"), but pleads with particularity the sort of facts absent in *Huang, see id.* ¶ 73 (alleging that CMIC's agents observed several specifically identified design features they excluded from the replacement cost estimate). These factual allegations also speak to the "bad faith" necessary to establish the second element.

An insurer acts in "bad faith" when its refusal to pay is not based on an honest disagreement or innocent mistake. *See Dailey v. Integon Gen. Ins. Corp.*, 75 N.C. App. 387, 396, 331 S.E.2d 148, 155 (1985). Valuing an insurance claim "is not an exact science," so bad faith cannot be inferred from the mere fact that a policy's dispute resolution process is resolved favorably to the insured. *See Lemons*, 2011 WL 2565617, at *4 (holding that an arbitrator agreeing with the insured to a figure higher than the insurer's best settlement offer "does not *ipso facto* mean that [the

17

insurer] engaged in unfair and deceptive trade practices or unfair claim settlement practices"). That said, insurers can be held liable for tortious bad-faith refusal to settle if they baselessly withhold payment and force the insured through the time and expense of that process. *See Robinson*, 86 N.C. App. at 50–51, 356 S.E.2d at 396.

Despite the insured's full recovery through his policy's appraisal process, *Robinson* reversed summary judgment for the insurer on a bad faith claim. *See id.* The plaintiff's forecast of evidence included statements by the insurer's agents that the covered property was a total loss, that the full claim would be promptly paid, and later that the payment was being withheld because the insured had retained a property loss consultant. *See Robinson,* 86 N.C. App. at 46, 356 S.E.2d at 393. While sufficient to survive summary judgment in *Robinson*, these sorts of unguarded admissions are not necessary to state a plausible bad faith claim.

The Middle District of North Carolina held in *Guessford* that an insurer's allegedly "willful failure to investigate [the insured's] claim and provide any reasonable settlement offer" satisfied this second element given the information the plaintiff had provided. *See* 918 F. Supp. 2d at 466. The plaintiff had sent his insurer extensive documentation detailing more than $725,000 in accident-related medical expenses. *See id.* at 464. Without explanation, his insurer offered to settle for $525,000 on the eve of an arbitration hearing. *See id.* at 466–67; *see also id.* at 458 (noting that the arbitration panel determined the plaintiff's claim to be worth $2.5 million).

Again, *Guessford's* reasoning applies here. The complaint alleges that Rose Hill "ma[de] all information reasonably required" to determine the costs to demolish and replace the church "reasonably available." *See* DE 1 ¶ 47. In particular, Rose Hill alleges that the inspection allowed CMIC's agents to observe many features that they omitted from their estimates. *See id.* ¶ 73. Rose Hill also alleges that CMIC made no other effort to understand the church's design before relying

on a software program that could not accurately calculate the cost of replacement with a structure of "comparable material and quality." *See id.* ¶ 67 . Finally Rose Hill alleges that CMIC did not explain its offer or provide any other "meaningful response" when advised that construction vendors were quoting figures three times higher than its underlying replacement cost estimate. *See id.* ¶¶ 53–54. These allegations suggest that CMIC willfully failed to investigate the claim and make a reasonable settlement offer.

As to the third element, "[a]ggravated conduct includes fraud, malice, gross negligence, [and] insult as well as actions denying coverage willfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights." *See First Protective Ins. Co.*, 516 F. Supp. 3d at 532 (internal quotation marks omitted); *see also Lovell*, 108 N.C. App. at 422, 424 S.E.2d at 185. *Guessford* noted in support of its finding of aggravated conduct that the insurer's settlement offer was "substantially lower than" the plaintiff's documented medical expenses. *See* 918 F. Supp. 2d at 467. Similarly, the North Carolina Court of Appeals credited "the substantial disparity between" the insured plaintiff's estimates and the insurer's estimate as a fact supporting aggravated conduct. *See Smith v. Nationwide Mut. Fire Ins. Co.*, 96 N.C. App. 215, 219, 385 S.E.2d 152, 154 (1989).

Rose Hill's complaint alleges that CMIC sought to settle this claim based on a replacement cost estimate that was roughly one-third of the actual costs to demolish and rebuild the structure. *See* DE 1 ¶ 51. CMIC estimated that the replacement costs were less than $1.8 million and offered to settle the claim based on the same. *See id.* ¶ 45. This offer was well below the Policy's coverage limit, much less what would be required to replace the burned church with a structure of "comparable material and quality." Rose Hill advised CMIC that construction vendors had quoted figures three times higher than this estimate but received no response. *See id.* ¶ 53; *see also id.*

¶ 59.  In line with these vendors' bids, Rose Hill's team estimated the replacement cost to be approximately $5.1 million, *see* DE 1 ¶ 62, and the parties' independent appraisers agreed during the dispute resolution process, *see id.* ¶ 79.  The substantial disparity between CMIC's low-ball offer and these other estimates suggests aggravated conduct.

Rose Hill's complaint includes other allegations of aggravated conduct.  The North Carolina Court of Appeals held that instructing contractors to lower their estimates "meets the requirement," *see Robinson*, 86 N.C. App. at 50, 356 S.E.2d at 396, and Rose Hill alleges that CMIC "pressured" BluSky personnel to do so, *see* DE 1 ¶ 72.  Likewise, CMIC's alleged "misrepresentations" constitute aggravated conduct.  *See* DE 1 ¶ 55 (claiming that CMIC misrepresented the construction methods covered by the Policy); *see also Guessford*, 918 F. Supp. 2d at 465 (finding this element to be satisfied where the insurer allegedly "misrepresented pertinent facts or insurance policy provisions").

To be clear, North Carolina law does not impose liability "in every case wherein the value of the damages is disputed and the claimant ultimately wins in the independent appraisal process." *See Robinson*, 86 N.C. App. at 51, 356 S.E.2d at 396.  But taking as true the facts alleged in Rose Hill's complaint, CMIC's agents saw specific structural features during their inspection, omitted these features from their estimates without a good-faith basis for doing so, sought to settle the claim based on a replacement cost estimate that was roughly one-third of what independent appraisers and construction vendors agreed to be necessary, and engaged in other forms of aggravated conduct.  Rose Hill adequately alleges the three elements necessary for the tort of an insurance company's bad-faith refusal to settle.  CMIC's motion for judgment on the pleadings as to Rose Hill's bad faith claim is thus denied.

## 2. Rose Hill's UDTPA Claim

Much of this same reasoning applies to Rose Hill's UDTPA claim as well. To establish an UDTPA violation, the plaintiff must show "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." *Gray v. N. Carolina Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000) (citing N.C. Gen. Stat 75-1.1). CMIC contends that Rose Hill has not adequately alleged the first element. *See* DE 24 at 19–23.

A plaintiff may obtain relief for violations of North Carolina's regulations of insurance practices set forth in N.C. Gen. Stat. § 58-63-15(11) under the UDTPA. *See, e.g.*, *Elliott v. Am. States Ins. Co.*, 883 F.3d 384, 396 (4th Cir. 2018). Conduct violating these provisions violates the UDTPA because "such conduct is inherently unfair, unscrupulous, immoral, and injurious to consumers." *See Gray*, 352 N.C. at 71, 529 S.E.2d at 683 ("We agree with the practice of looking to N.C.G.S. § 58–63–15(11) for examples of conduct to support a finding of unfair or deceptive acts or practices.").

Rose Hill argues that CMIC violated subsections (f) and (h) of section 58-63-15(11). *See* DE 30 at 13–14; DE 1 ¶¶ 95, 102 (incorporating an alleged violation of subsection (f)); *id.* ¶¶ 97, 102 (incorporating the allegation that CMIC's settlement reflected a valuation position that was "so devoid of factual or legal merit as to be patently unreasonable"). Subsection (f) of section 58-63-15(11) prohibits insurers from "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear[.]" Subsection (h) of section 58-63-15(11) prohibits insurers from "[a]ttempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled[.]"

Violations of subsections (f) and (h) require more than the resolution of a valuation dispute in the insured's favor. *See Elliott*, 883 F.3d at 399 ("[I]t cannot be that an insurance company per

se engages in an unfair or deceptive trade practice simply because the settlement offers made are less than the final judgment rendered"). The same "reasonably clear" standard of liability applies to both subsections. *Neshat v. Nationwide Mut. Fire Ins. Co.,* No. 5:20-CV-664-D, 2021 WL 2168906, at \*4 (E.D.N.C. May 27, 2021). Taken as true, Rose Hill's factual allegations meet this standard and plausibly state violations of subsections (f) and (h).

As detailed above, Rose Hill alleges that CMIC omitted structural features its agents had observed from its estimate of the costs to replace the structure with one of "comparable material and quality." While "advocating a position that is ultimately determined to be incorrect does not necessarily demonstrate a lack of good faith in attempting to settle a claim," *Cent. Carolina Bank & Tr. Co. v. Sec. Life of Denver Ins. Co.*, 247 F. Supp. 2d 791, 801 (M.D.N.C. 2003), the complaint alleges the deliberate exclusion of specific features CMIC knew to be covered by the Policy. Rose Hill further alleges that CMIC did not revise its estimate or offer after being advised that market participants quoted three times as much to demolish and replace the church structure. *See* DE 1 ¶ 53. These allegations, taken together with the disparities described above, amount to a claim that CMIC deliberately sought to settle this claim for less than a reasonable man would have believed he was owed. CMIC's motion for judgment on the pleadings as to Rose Hill's UDTPA claim is thus denied.

## IV. Conclusion

In sum, Rose Hill alleges that CMIC sought to settle its claim based on an unreasonably low replacement cost estimate after intentionally omitting certain of the church's structural features before Rose Hill invoked the Policy's dispute resolution provision and was awarded the maximum amount recoverable. Although its allegations about CMIC's conduct preceding that payment do not support a plausible breach of contract claim, they do support plausible bad faith

and UDTPA claims.[1]  The factual dispute about whether CMIC's agents observed the structural features omitted from its earlier estimate and offer cannot be resolved at this stage.

Thus, the court GRANTS IN PART and DENIES IN PART CMIC's motion for judgment on the pleadings [DE 23].  The court GRANTS judgment on the pleadings as to Rose Hill's breach of contract claim and denies the motion as to Rose Hill's bad faith and UDTPA claims.

SO ORDERED this __11th__ day of July, 2022.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

---

[1] Any choice of remedies between punitive damages under the bad faith claim and statutory damages under the UDTPA claim would be a matter for trial. *See Guessford*, 918 F. Supp. 2d at 467 n.6.